UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                              :
SECURITIES AND EXCHANGE COMMISSION,          :
                                                              :
                            Plaintiff,                        :
                                                              :         19 Civ. 8621 (JPC)
            -v-                                               :
                                                              :              OPINION
TOM SIMEO,                                                    :           AND ORDER
                                                              :
                            Defendant.                        :
                                                              :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

 The Securities and Exchange Commission ("SEC") brought this securities fraud action against Tom Simeo, who is proceeding *pro se*. Until 2017, Simeo served in various leadership roles at Viking Energy Group, Inc. ("Viking"), including Chief Executive Officer ("CEO"), Executive Chairman, Chairman of the Board, Director, and Treasurer. The SEC alleges that Simeo lied in several public filings and letters to outside auditors by representing that Viking's Chief Financial Officer ("CFO") was an individual named Guangfang "Cecile" Yang, and that Yang performed work consistent with that of a CFO. But in reality, the SEC says, Yang did not actually serve as Viking's CFO. Further, the SEC alleges that Simeo failed to disclose that he purportedly had authority to review and certify SEC filings on Yang's behalf, and that he could unilaterally remove Yang from her position at any time.

 The SEC alleges that Simeo's actions violated section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77q(a)(1), (a)(3). Before the Court is the SEC's unopposed motion

for summary judgment.  For the reasons stated below, the Court grants the SEC's motion.

## I.  Background

### A.  Factual Background

The following facts are taken from the SEC's Local Civil Rule 56.1 Statement of Material Facts.  Dkt. 55 ("56.1 Statement" or "56.1 Stmt.").  Because Simeo did not respond to the SEC's 56.1 Statement by filing his own Rule 56.1 statement, he has failed to dispute any of these facts, and they are deemed admitted.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) ("[T]he failure to respond [to a Rule 56.1 statement] may allow the district court to accept the movant's factual assertions as true."); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *see also* Local Civ. R. 56.1(c).

Viking is a publicly traded company, formerly known as Viking Investments Group, Inc., that is incorporated in Nevada.  56.1 Stmt. ¶ 2.  From November 2014 through May 2016, Viking's office was in New York.  *Id.* ¶ 4.  The Court refers to this time period as the "Relevant Period." *See id.*

During the Relevant Period, Viking was subject to SEC reporting requirements.  *Id.* ¶ 9.  As such, it was required to publicly file on an annual basis a Form 10-K and, for the first three quarters of its fiscal year, a Form 10-Q.  *See id.* ¶ 10.  Both of these filings "contain valuable information for investors about the company's business, the risks it faces, and its operating and financial reports, as well as information about the company's management, corporate governance, disclosure controls and procedures, and internal control over financial reporting."  *Id.* ¶ 12.  The Sarbanes-Oxley Act of 2002 requires the CEO and CFO to certify the following information with each filing of a Form 10-K or Form 10-Q: (1) "that those filings are accurate and complete and do not contain any

material misrepresentations or omissions"; (2) "that the company's financial statements fairly present the operations and financial condition of the company"; (3) "that the CEO and CFO are responsible for the company's internal controls"; (4) "that they have evaluated the effectiveness of those internal controls"; and (5) "that they have disclosed to the company's outside auditors any significant deficiencies in the company's internal controls and any fraud, whether or not material, that involves management." *Id.* ¶ 18.  The Court refers to these certifications as the "SOX Certifications."

During the Relevant Period, Viking filed a Form 10-K for the 2014 and 2015 fiscal years, as well as an amended Form 10-K/A for the 2015 fiscal year.  *Id.* ¶ 21.  Viking also filed five Form 10-Qs during this time for the following quarters: Q3 of 2014, Q1 of 2015, Q2 of 2015, Q3 of 2015, and Q1 of 2016.  *Id.* ¶ 22.  SOX Certifications were attached to six of these forms, all except the Form 10-K for the 2015 fiscal year and the Form 10-Q for Q1 2016.  *Id.* ¶¶ 23, 24.

From August 15, 2008 to December 12, 2014, Simeo served as Viking's CEO, Chairman of the Board of Directors, Director, and Treasurer.  *Id.* ¶ 5.  On December 12, 2014, he stepped down as CEO, *id.* ¶ 6, and James Doris took over the head role, *id.* at 2 n.3.  Simeo was then appointed Executive Chairman and served in that role (as well as continued serving as Chairman of the Board of Directors and Treasurer) until his resignation in May 2017.  *Id.* ¶ 6.

In 2013, Simeo hired Yang, who lives in Shanghai, China, to be Viking's CFO.  *Id.* ¶¶ 33-34.  Yang served in that position until she purportedly resigned in July 2016.  *See id.* ¶¶ 35, 52 & 14 n.9.  When Yang joined the company, Simeo fabricated a standing resignation letter, *id.* ¶ 85, in which Yang purported to "irrevocably" resign her position with Viking "at any time desired by the Company" and "[u]pon notification that the Company accepted [her] resignation," *id.* ¶ 83 (alterations in original) (internal quotation marks omitted).  Simeo forged Yang's signature on this

document.  *Id.* ¶ 85.  This letter allowed Simeo to remove Yang from the position of CFO whenever he pleased.  *See id.* ¶ 84.  Simeo also fabricated a power of attorney purportedly signed by Yang that allowed Simeo to "affix Yang's signature to any and all documents," including documents that Viking had to file with the SEC.  *Id.* ¶¶ 86, 88.

Viking represented to the public that Yang was the company's CFO and a member of its Board of Directors.  *Id.* ¶ 35.  But "Yang never actually functioned as Viking's CFO."  *Id.* ¶ 60. She "was not involved in the financial and strategic decisions" of Viking during the Relevant Period.  *Id.* ¶ 47.  Nor did she play any role in "preparing Viking's financial statements or public filings."  *Id.* ¶ 50; *see also* ¶ 58.  Indeed, at least as of April 3, 2015, Yang did not do "any work" on Viking's financial statements and did not speak with anyone who was preparing them.  *Id.* ¶ 49. She also did not "review or evaluate Viking's internal controls over financial reporting."  *Id.* ¶ 48. Further, during most or all of the Relevant Period, Viking did not compensate Yang despite the fact that she was the company's highest ranking financial employee.  *Id.* ¶ 132.  Nevertheless, Simeo says that he personally paid her in cash.  *Id.* ¶ 133.

Yang's "sole point of contact" at Viking was Simeo.  *Id.* ¶ 45.  Indeed Simeo was "the only person at Viking who communicated with Yang."  *Id.*  Thus many people at Viking never interacted with Yang.  Despite the fact that Doris has served as Viking's CEO since December 2014, he "has never met or spoken to Yang either in person or through any other means, and he has never communicated with Yang in writing."  *Id.* ¶ 37.  In April 2015, Simeo hired Frank Barker as an "outside consultant" to prepare Viking's financial statements and its SEC filings.  *Id.* ¶ 39.  Barker also "has never met, spoken with, emailed with, or otherwise communicated with Yang."  *Id.* ¶ 41. Nor did Viking's outside counsel, Lance Brunson (who also reviewed Viking's public filings), ever communicate with Yang.  *Id.* ¶ 43.  Because Yang did not do any financial work, Simeo, Barker,

4

and Viking's outside auditors were the ones who "managed Viking's books and records, prepared Viking's financial statements and periodic reports, and worked . . . to prepare and submit these documents to the SEC." *Id.* ¶ 50.  From April 2015 to May 2016, Barker followed Simeo's instructions with regard to Viking's public filings and "understood Simeo to be the person who ultimately approved Viking's public filings." *Id.* ¶ 51.

Despite Yang's lack of actual work for Viking, all of Viking's SEC filings and SOX Certifications during the Relevant Period listed Yang as Viking's CFO. *Id.* ¶¶ 91-92, 94-95, 98. The SEC filings also included a biography of Yang. *See id.* ¶ 110.  To draft this, Simeo provided Brunson with a copy of what he represented were Yang's résumé and curriculum vitae. *Id.* ¶ 109. The résumé said that Yang graduated from Hult International Business School's Executive MBA Track Program in London in 2009. *Id.* ¶ 111.  Accordingly, several SEC filings said that Yang graduated from this program. *Id.* ¶ 112.  However, that school has no record of anyone with Yang's name, or a similar name, and the school did not even offer that program at its London campus until 2011. *Id.* ¶¶ 113-17.

In addition to listing Yang as the CFO, several SEC filings stated that Yang had "designed, supervised, and evaluated [Viking's] internal controls over financial reporting and disclosure controls and procedures." *Id.* ¶ 93; *see, e.g.*, Dkt. 56, Exh. 49 at 16 ("[Viking's] internal control over financial reporting is a process designed under the supervision of [Viking's] Chief Executive Officer and Chief Financial Officer.").  And all of the SOX Certifications included a certification by Simeo and Yang that they disclosed to auditors "any fraud, whether or not material, that involves management or other employees who have a significant role in [Viking's] internal control over financial reporting." 56.1 Stmt. ¶ 101 (internal quotation marks omitted).

None of the SEC filings disclosed that Yang had given Simeo a power of attorney that

authorized him to review and sign the filings on her behalf or that she had purportedly signed a standing resignation letter.  *Id.* ¶¶ 102-03.  The filings also did not disclose that Yang was compensated in cash by Simeo personally.  *Id.* ¶ 134.  Despite this, Simeo certified that each of the SOX Certifications "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the relevant filing. *Id.* ¶ 99.

Moreover, during the Relevant Period, Simeo signed three management representation letters that Viking provided to outside auditors.  *Id.* ¶¶ 120-21.  Each stated that Simeo had "no knowledge of any fraud or suspected fraud affecting [Viking] involving management."  *Id.* ¶ 122. The letters also confirmed that Yang, along with Simeo, was responsible for establishing and maintaining "effective internal control over financial reporting" and other measures to ensure an accurate representation of Viking's financial picture.  *Id.* ¶ 123.  Two of the letters included what appears to be Yang's handwritten signature.  *Id.* ¶ 128.  Simeo forged Yang's signature on at least one of the letters.  *Id.* ¶ 131.

During the Relevant Period, Viking raised approximately $2 million through the sale of securities.  *Id.* ¶ 135.  Simeo signed some of the securities purchase agreements with regard to these sales and represented that Viking's SEC filings were materially accurate.  *Id.* ¶ 137.

**B.  Procedural History**

The SEC initiated this action against Simeo by filing a Complaint on September 17, 2019. Dkt. 1.  This case was initially assigned to the Honorable Paul G. Gardephe.  Simeo filed an answer on January 15, 2020.  Dkt. 12.  The SEC later filed an amended complaint on August 18, 2020. Dkt. 32 ("Amended Complaint" or "Am. Compl.").  In the Amended Complaint, the SEC alleges

that Simeo violated section 10(b) of the Exchange Act and Rule 10b-5, Am. Compl. ¶¶ 41-43, as well as sections 17(a)(1) and 17(a)(3) of the Securities Act, Am. Compl. ¶¶ 38-40.

### 1. Simeo's Conduct During This Litigation

Judge Gardephe entered a case management plan and scheduling order on June 22, 2020. Dkt. 22.  Simeo did not comply with many of his discovery obligations under this plan.  After the SEC alerted the Court that Simeo had failed to respond to the SEC's discovery requests, the Honorable Robert W. Lehrburger, United States Magistrate Judge, ordered Simeo to "provide initial disclosures and comply with the discovery requests served on him."  Dkt. 33 at 1.  Simeo failed to comply with this Court order.  *See* Dkt. 37.  In fact, Simeo failed to produce any discovery at all until the final day of the fact discovery period.  *See* Dkt. 45 at 1.  Judge Lehrburger found that "[t]he SEC ha[d] been severely prejudiced by not having been able to act on and pursue investigation and discovery of the information belatedly disclosed by Simeo" particularly because Simeo repeatedly invoked the Fifth Amendment to the United States Constitution in response to questioning at his deposition.  *Id.*

One way that Simeo failed to comply with his discovery obligations is that he did not respond to the SEC's Requests for Admission ("RFAs").  *See* 56.1 Stmt. at 7 n.4; *see also* Dkts. 33, 37.  Simeo also did not produce any communications between Yang and him or anyone at Viking during the Relevant Period.  56.1 Stmt. ¶ 62.  In response to a subpoena, Viking produced thousands of documents, but none included communications with Yang.  *Id.* ¶ 61; *see also id.* ¶ 63.

During the Relevant Period, Simeo primarily communicated with Yang through a messaging and social media application called WeChat or via e-mail.  *Id.* ¶ 65.  Simeo's ex-wife, Elle Zhong, served as an "intermediary and translator" for all conversations between Simeo and Yang.  *Id.* ¶ 65; *see also id.* ¶ 76.  Simeo used two devices to communicate with Yang via WeChat:

a Lenovo ThinkPad laptop and a Samsung Galaxy cell phone.  *See id.* ¶ 67.[1]  Simeo exposed the ThinkPad to "excessive heat in order to damage it and conceal documents . . . from the SEC."  *Id.* ¶ 68.  Because of this, the SEC could not recover any data from the ThinkPad.  *Id.* ¶ 69.  As for the Samsung Galaxy, a forensic examination revealed that it contained more than 10,000 WeChat messages, *id.* ¶ 71, but Simeo only produced ten to the SEC, *id.* ¶ 73.  These ten messages were "sent, received, and/or created in 2017," and thus after the Relevant Period.  *Id.* ¶ 74.  Some of the messages Simeo produced were from a conversation that occurred in April 2017.  *Id*. ¶ 78.  In these messages, someone named "tom" (presumably Simeo) sent a message to "Elle" (presumably Simeo's ex-wife, serving as intermediary) asking Yang to review Viking's Form 10-Q for Q3 2015.  *Id.* ¶ 80.  "Elle" responded that "cecile" (presumably Yang) was "ok with the filing."  *Id.* (internal quotation marks omitted).  When asked at his deposition why he would have asked Yang (who purportedly resigned from Viking in July 2016) in 2017 to review an SEC filing that had already been publicly filed with the SEC in November 2015, Simeo had no answer and then invoked the Fifth Amendment.  *See id.* at 14 n.9.  Simeo fabricated these WeChat messages (on the date that he was required to respond to a subpoena from the SEC) in an effort to produce evidence of Yang serving as Viking's CFO.  *Id.* ¶¶ 81, 82.

Simeo was deposed as part of this action on September 8, 2020.  *See* Dkt. 56, Exh. 21 ("Simeo Dep. Tr.").  Although he answered some questions, he invoked the Fifth Amendment in response to many.  *See id.* at 35-36, 50-51, 59-60.  For example, he invoked the Fifth Amendment in response to the following questions: (1) "Isn't it true that Ms. Yang did not function as Viking's CFO during the period 2014 to 2016?"; (2) "Isn't it the case that in . . . [Form] 10-Ks, [Form] 10-

---

[1] Simeo also claimed to have used a Lenovo Yoga laptop for these communications, 56.1 Stmt. ¶ 67, but a forensic examination showed that WeChat had never been used on that device, *id.* ¶ 70.

Qs and SOX [C]ertifications, you represented that Yang was functioning as Viking's CFO?";
(3) "[I]sn't it true that you signed those documents containing that representation even though you
knew that Ms. Yang was not functioning as Viking's CFO?"; and (4) "Was [the standing resignation
letter] a document that you actually fabricated?".  *Id.* at 42-43, 57.

### 2.  The SEC's Motion for Summary Judgment

This case was reassigned to the undersigned on September 29, 2020.  On November 13,
2020, the SEC filed a motion for summary judgment, Dkt. 53, a memorandum of law in support of
its motion, Dkt. 54 ("Motion"), the 56.1 Statement, and a Declaration from Olivia S. Choe, counsel
for the SEC, with seventy accompanying exhibits in support of the SEC's motion, Dkt. 56.

Simeo never filed an opposition brief to the SEC's motion.  His opposition initially was due
on December 4, 2020.  However, on November 30, 2020, the Court received a letter from Simeo
dated November 27, 2020 in which he stated that he had contracted COVID-19 and requested an
extension.  Dkt. 59.  The Court granted this motion and ordered Simeo to submit his opposition by
January 4, 2021.  Dkt. 60.  On January 5, 2021, the Court received a letter from the SEC in which
the   SEC   explained   that   on   January   4,   2021,   Simeo   had   sent   an   e-mail   to
NYSD_ECF_Pool@nysd.uscourts.gov and copied counsel for the SEC.  Dkt. 62.  The SEC attached
to its letter a copy of this e-mail, in which Simeo stated that he was still sick with COVID-19 and
requested an additional thirty days to oppose the SEC's motion.  Dkt. 62-3.  The Court granted this
request and ordered Simeo to file his opposition brief by February 4, 2021.  Dkt. 63.  On February
4, 2021, the Court received a letter dated February 4, 2021 in which Simeo said he was "still very
sick and bedridden" and requested a third extension.  Dkt. 64.  The Court  granted this and ordered
that Simeo file his opposition by March 4, 2021.  Dkt. 65.

On March 8, 2021, the Court received a letter dated March 5, 2021 from Simeo in which he

said that he "may have been infected a second time by a mutation of the COVID-19 virus" and requested additional time to file his opposition. Dkt. 66. Specifically, he asked to file his brief by April 15, 2021. *Id.* The SEC opposed this fourth request and argued that Simeo had offered "no plausible basis for his continued failure to respond" to the SEC's motion. Dkt. 67 at 3. On March 8, 2021, the Court granted Simeo's request in part and ordered Simeo to file any opposition by April 5, 2021, more than four months after his initial deadline. Dkt. 68 at 2. The Court stated that this would serve "as the final extension for [Simeo's] opposition" and warned that it would "not grant further extensions." *Id.* It also stated that "[i]f [Simeo] fails to file an opposition to [the SEC's] motion for summary judgment . . . by April 5, 2021, the Court will deem [the SEC's] motion to be fully submitted." *Id.* Simeo did not file an opposition by April 5, 2021, and on April 7, 2021, the SEC requested that the Court deem the SEC's motion to be fully submitted. Dkt. 69. On July 18, 2021, the Court deemed the SEC's motion fully submitted after it still had not received any opposition from Simeo. Dkt. 70.[2]

## II. Legal Standard

A district court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" and "[a] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must

---

[2] The Court directed the Clerk of Court to mail a copy of its July 18, 2021 Order to Simeo, but this was returned to the Court as undeliverable. However, the Court has no doubt that Simeo had notice that failure to oppose the SEC's motion for summary judgment could result in judgment being entered against him. On January 15, 2020, Simeo consented to receive service electronically via the ECF system and agreed that he would "no longer receive paper copies of . . . orders" and other court filings. Dkt. 10. Simeo thus received all of the Court's orders via ECF.

"resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co.*, 373 F.3d at 244.

"Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Id.* at 242.  In the event that a party fails to oppose a motion for summary judgment, "the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Id.* at 244.  "Although the failure to respond may allow the district court to accept the movant's factual assertions as true, *see* Local Civ. R. 56.2, the moving party must still establish that the undisputed facts entitled [it] to a judgment as a matter of law." *Id.* at 246 (internal quotation marks omitted).

"Summary judgment may be granted against a *pro se* party who has filed no opposition if: (1) he 'has received adequate notice that failure to file any opposition may result in the entry of summary judgment without trial;' and (2) 'the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law.'" *SEC v. Kinnucan*, 9 F. Supp. 3d 370, 374 (S.D.N.Y. 2014) (quoting *Orix Credit All., Inc. v. Queen City Transp., Inc.*, No. 00 Civ. 2778 (NRB), 2001 WL 83236, at *2 (S.D.N.Y. Jan. 31, 2001)).

### III. Discussion

Simeo received "adequate notice that failure to file any opposition may result in the entry of summary judgment without trial" because of the SEC's compliance with Local Civil Rule 56.2. *Id.*  This rule required the SEC to provide Simeo notice that if he did not respond to the SEC's motion, the Court could accept the SEC's facts as true and might enter judgment in the SEC's favor without a trial.  *See* Local Civ. R. 56.2.  The SEC provided this notice to Simeo on November 13, 2020, the same day that the SEC filed its motion.  Dkt. 57.

Moreover, the Court specifically warned Simeo on March 8, 2021 that if Simeo failed to file an opposition by April 5, 2021, the Court would deem the SEC's motion to be fully submitted. Dkt. 68.  The Court then did so on July 18, 2021 and informed the parties that it would render a decision in due course.  Dkt. 70.  Thus, the Court may grant the SEC's motion for summary judgment motion so long as the summary judgment standard is otherwise satisfied.  *Kinnucan*, 9 F. Supp. 3d at 374.

## A.  Deemed Admissions and Adverse Inferences

As discussed above, failure to respond to a motion for summary judgment "does not alone discharge the burdens imposed on a moving party."  *Vt. Teddy Bear Co.*, 373 F.3d at 246.  Although Simeo's failure to respond here allows the Court to accept the SEC's factual assertions as true, *see* 56.1 Stmt., the SEC "must still establish that the undisputed facts entitled [it] to a judgment as a matter of law."  *Vt. Teddy Bear Co.*, 373 F.3d at 246 (internal quotation marks omitted).  This means that the Court must ensure that "evidence in the record supports" the undisputed assertions contained in the SEC's 56.1 Statement.  *Id.* at 244.

This venture is complicated somewhat by Simeo's conduct during discovery, namely his failure to respond to the SEC's RFAs, *see* Dkt. 56, Exh. 16 ("SEC's RFAs"), and his frequent invocation of the Fifth Amendment during his deposition.  Simeo's failure to respond to the SEC's RFAs means that the matters contained therein are deemed admitted.  *See* Fed. R. Civ. P. 36(a)(3). Because they are deemed admitted, the Court can rely on the content of the RFAs to support the SEC's factual assertions.  *See SEC v. Batterman*, No. 00 Civ. 4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002).

Second, Simeo's invocation of the Fifth Amendment with regard to several areas of questioning leads the Court to draw an adverse inference against Simeo with regard to those topics.

The Supreme Court has recognized "the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Mitchell v. United States*, 526 U.S. 314, 328 (1999) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)); *accord Collazos v. United States*, 368 F.3d 190, 203-04 (2d Cir. 2004) (explaining that an adverse inference is appropriate when a defendant deprives the government of an "opportunity to conduct a deposition"); *SEC v. Suman*, 684 F. Supp. 2d 378, 386-87 (S.D.N.Y. 2010) ("A court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." (internal citation omitted)), *aff'd*, 421 F. App'x 86 (2d Cir. 2011). This inference is further "buttressed" by Simeo's failure to comply with discovery orders and his destruction of information contained on one of his electronic devices. *Id.* at 387.

Nonetheless, "a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist." *Id.* at 386. Thus while the Court concludes that Simeo's assertion of the Fifth Amendment warrants drawing an adverse inference, the Court does not rely on this adverse inference alone. Nor does it rely solely on the deemed admissions. Instead, the Court considers the adverse inference and Simeo's deemed admissions along with all other evidence in the record. *See* Dkt. 56. Considering all of the evidence in the record, and for the reasons stated below, the Court concludes that the evidence here supports the SEC's factual assertions and that the SEC is entitled to judgment as a matter of law.

**B.  Section 10(b) of the Exchange Act and Rule 10b-5**

"Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase

or sale of a security, are violated if a person has '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'"  *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quoting *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013)).  For a representation or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

The thrust of the SEC's theory of liability is that Simeo made several material misrepresentations and omissions regarding Yang's role as Viking's CFO.  In short, the SEC contends that Yang did not actually serve as the company's CFO or certify its financial reports, as many of the SEC filings and SOX Certifications stated she did.  The SEC also argues that Simeo omitted that he held a power of attorney for Yang and could unilaterally remove her from her position.  In order to determine whether the SEC is entitled to judgment as a matter of law, the Court evaluates each of the three elements that the SEC must prove for its claim under section 10(b) and Rule 10b-5.

### 1.  Material Misrepresentations and Omissions

The SEC first must prove that Simeo "made a material misrepresentation or a material omission as to which he had a duty to speak."  *Frohling*, 851 F.3d at 136.  This element is met here because the evidence demonstrates that Simeo made several material misrepresentations and omissions with regard to Yang's role as Viking's CFO.

First, the evidence indisputably shows that Viking's SEC filings contained several statements pertaining to Yang's role as CFO.  For example, the Form 10-K for fiscal year 2014

14

listed Yang as CFO, Dkt. 56, Exh. 49 at 19, and contained a biography in which it stated that she graduated from Hult International Business School in London as part of that institution's MBA Executive Track Program, *id.* at 20.  The 2014 Form 10-K was signed by Simeo and Yang.  *Id.* at 27.  The same information was included on the Form 10-K/A for fiscal year 2015, *see* Dkt. 56, Exh. 58 at 26-27, which was also signed by Simeo and Yang, *id.* at 35.  The quarterly reports too were signed by Yang in her capacity as CFO.  *See* Dkt. 56, Exh. 47 at 21 (Q3 2014 Form 10-Q); Dkt. 56, Exh. 51 at 23 (Q1 2015 Form 10-Q); Dkt. 56, Exh. 53 at 25 (Q2 2015 Form 10-Q); Dkt. 56, Exh. 55 at 9 (Q3 2015 Form 10-Q); Dkt. 56, Exh. 60 at 27 (Q1 2016 Form 10-Q).

The record further supports the conclusion that these statements in the SEC filings were misrepresentations because Yang did not actually function as Viking's CFO or review any of Viking's public filings.  At his deposition, Simeo failed to respond to the SEC's question, "Isn't it true that Ms. Yang did not function as Viking's CFO during the period 2014 to 2016?" and instead invoked the Fifth Amendment.  Simeo Dep. Tr. at 42.  The Court draws a negative inference from this response and others like it that Simeo gave at various points during the SEC's investigation. *See* Dkt. 56, Exh. 20 at 370 (Simeo invoking the Fifth Amendment in response to the SEC asking whether it was true that Yang "did no substantive work for Viking" and whether it was true that Simeo "made up the existence of Ms. Yang").  Further, multiple people closely involved with Viking said that they had no contact with Yang, and that Yang did not partake in the financial or strategic decisions of the company.  *See* Dkt. 56, Exh. 4 ¶ 6 (declaration from Doris stating that Yang "was not involved in the financial and strategic decisions of [Viking] that [Doris] was working on and [Doris] had no direct interactions with Ms. Yang" from the fall of 2014 through July 2016); Dkt. 56, Exh. 2 ¶ 10 (declaration from Barker explaining that he assisted Viking with the filing of its SEC documents, but that he had "no personal knowledge of Yang performing any work for

Viking from April 2015 through May 2016").  To think Yang served as CFO during this time, but the CEO and other individuals involved with Viking's SEC filings never once spoke with her, strains all logical credulity.  The RFAs, which are deemed admitted, further support the conclusion that Yang was not, in fact, Viking's CFO.  *See* SEC's RFAs at 6 ¶¶ 7-12 (stating that between September 2014 and July 2016, Yang was not involved in preparing Viking's financial reports, Yang did not review any of Viking's records, and that instead, Simeo performed the "duties and functions of a CFO for Viking").

Moreover, none of the SEC filings disclosed that Simeo had a power of attorney for Yang, or that he could accept Yang's resignation at any time he wanted.  These were material omissions because the power of attorney purportedly gave Simeo the authority to review and sign documents (including SEC filings) on Yang's behalf, and the standing resignation letter placed Yang's tenure at Viking solely in Simeo's hands.  SEC's RFAs at 8 ¶¶ 33 (explaining that the power of attorney gave Simeo "the authority to review and sign the [SEC filings] on Yang's behalf"), 37 (explaining that the standing resignation letter "gave [Simeo] the authority to unilaterally remove Yang as Viking's CFO").  Further, Exchange Act Rule 13a-14(c) states a person required to provide a SOX Certification (*i.e.*, a CEO or CFO) "may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority."  17 C.F.R. § 240.13a-14(c).  Many Viking investors would presumably want to know if the CEO or CFO was violating an Exchange Act Rule, particularly one that is aimed at ensuring that both individuals independently certify required public filings.

These omissions were particularly crucial because the power of attorney and standing resignation letter gave Simeo control over Yang in a way that jeopardized her independence as a CFO.  According to a report from Joseph Weber, the SEC's expert and a professor at the

Massachusetts Institute of Technology Sloan School of Management, CFO independence from the CEO "is likely to be viewed by investors to be important, as more independent CFOs generally provide financial statements that are less likely to contain material omissions, misstatements, or other forms of accounting manipulations." Dkt. 56, Exh. 1-A ¶ 39. Further, characteristics of a CFO "are associated with important strategic and accounting decisions" and thus "when a company provides its investors with information regarding certain CFO characteristics," like holding an MBA, "those investors can anticipate the firm will engage in certain types of strategic decisions." *Id.* ¶ 32; *see also id.* ¶ 34.[3]

In all of these communications, Simeo made material misrepresentations and omissions because disclosure of the relevant information would have altered the "total mix of information" available to investors. *Basic Inc.*, 485 U.S. at 232 (internal quotation marks omitted). Indeed, at least one investor would not have invested in Viking had he known that "Viking's chief financial officer was not doing substantive work for the company." Dkt. 56, Exh. 7 ¶ 4. The Court concludes that there is no genuine issue of material fact with respect to whether Simeo "made . . . material misrepresentation[s] or material omission[s] as to which he had a duty to speak." *Frohling*, 851 F.3d at 136.

### 2. Scienter

The SEC must also demonstrate that Simeo made these material misrepresentations or omissions "with scienter." *Frohling*, 851 F.3d at 136. "Scienter, as used in connection with the

---

[3] In support of its motion, the SEC also relies on Simeo's conduct with regard to certain letters to Viking's outside auditors. Motion at 19-20. The Court concludes that the evidence in the record supports the SEC's assertions that Simeo made material misrepresentations in these communications as well. *See, e.g.*, Dkt. 56, Exh. 61 (representing that Yang was Viking's CFO and that neither Simeo nor Yang had "knowledge of any fraud or suspected fraud affecting" Viking); Dkt. 56, Exh. 63 (same). Further, none of the letters disclosed that Simeo could review and sign Viking's SEC filings on behalf of Yang. *See, e.g.*, Dkt. 56, Exhs. 61, 63.

securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).  "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) (Lynch, J.), *aff'd*, 300 F. App'x 70 (2d Cir. 2008).

Here, the evidence in the record regarding Simeo's conduct easily supports the conclusion that he acted with the requisite scienter.  Simeo admitted, through his failure to respond to the SEC's RFAs, that he "knew that Yang was not functioning as Viking's CFO" and that he "knew that the [SEC filings] did not disclose that Yang was not functioning as Viking's CFO."  SEC's RFAs at 9-10 ¶¶ 50, 53; *see also id.* ¶¶ 51-52, 54-57, 60-61.  This shows Simeo acted with scienter because he "[r]epresent[ed] information as true while knowing it [was] not" or, at the very least, "recklessly misstat[ed] information."  *Universal Express, Inc.*, 475 F. Supp. 2d at 424.  This conclusion is further bolstered by the fact that not a shred of evidence exists suggesting that Yang and Simeo ever communicated about Viking's finances or SEC filings.  Indeed, the only evidence Simeo put forth were messages purporting to be a conversation in which Yang told Simeo's ex-wife that she approved a 2015 SEC filing, but that actually were exchanged in 2017.  *See* Dkt. 56, Exh. 25.

Moreover, "[w]here it is appropriate to draw an adverse inference from a witness's invocation of the Fifth Amendment, the defendant can be 'found to have acted with the requisite scienter.'" *United States v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 451 (S.D.N.Y. 2017) (quoting *SEC v. Glob. Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 118 (D. Conn. 2004)).  Here, the adverse inference drawn in light of Simeo's assertion of the Fifth Amendment further shows that he acted

with scienter.  *See, e.g.*, Simeo Dep. Tr. at 42 (Simeo invoking the Fifth Amendment in response to the SEC's question, "Isn't it true that you knew that Ms. Yang was not functioning as Viking's CFO during this period of 2014 to 2016?"); *id.* at 44 (Simeo invoking the Fifth Amendment in response to the SEC's question, "Isn't it the case that you knew that the false information in those [SEC] filings mattered to investors who were considering investing in Viking?").

The Court concludes that there is no genuine issue of material fact with regard to whether Simeo acted with scienter.

### 3.  In Connection with the Purchase or Sale of Securities

"The 'in connection with' factor has been broadly construed."  *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002).  "Any statement that is reasonably calculated to influence the average investor satisfies the 'in connection with' requirement of Rule 10b-5."  *Id.* at 491-92 (quoting *SEC v. Hasho*, 784 F. Supp. 1059, 1106 (S.D.N.Y. 1992)); *see also SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 861-62 (2d Cir. 1968).

The SEC filings that contained the material misrepresentations and omissions were filed during the Relevant Period.  During this time, Viking sold approximately $2 million worth of securities through private placements.  *See* Dkt. 56, Exhs. 64-69.  Given the broad construction afforded this element, the Court readily concludes that the material misrepresentations and omissions were "in connection with" the purchase or sale of securities because they could have influenced "the average investor" to make these purchases.  *Credit Bancorp, Ltd.*, 195 F. Supp. 2d at 492.

\*      \*      \*

In sum, the Court concludes that the SEC has shown that there is no genuine issue of material fact with respect to its claim that Simeo violated section 10(b) of the Exchange Act and Rule 10b-5.

Therefore, the SEC is entitled to judgment as a matter of law.  *See Frohling*, 851 F.3d at 136-38; *Vt. Teddy Bear Co.*, 373 F.3d at 242, 244.  The Court thus grants summary judgment in favor of the SEC on this claim.

## C.  Sections 17(a)(1) and 17(a)(3) of the Securities Act

"Section 17(a)(1) of the Securities Act makes it unlawful to 'employ any device, scheme, or artifice to defraud' in the offer or sale of securities."  *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (quoting 15 U.S.C. § 77q(a)(1)).  "'Essentially the same elements are required under Section 17(a)(1)' as under Section 10(b) and Rule 10b-5, except that Section 17(a)(1) requires proof of a connection with the 'offer or sale' of securities, instead of the 'purchase or sale' of securities."  *Id.* (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).  Because the Court already concluded that the elements of section 10(b) of the Exchange Act and Rule 10b-5 are satisfied, it need only determine whether the SEC has shown a connection with the "offer or sale" of securities.

For the same reasons that the evidence in the record shows that Simeo's material misrepresentations and omissions were "in connection with" the *purchase* or sale of securities, the evidence also demonstrates that his material misrepresentations and omissions were "in connection with" the *offer* or sale of securities.  *See* Dkt. 56, Exhs. 64-69 (showing that Viking sold, and thus offered, approximately $2 million worth of securities during the Relevant Period).

Section 17(a)(3) prohibits engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(3).  "To properly state a claim under Section 17(a)(3), the necessary elements are the same as those for Section 10(b) and 17(a)(1), although plaintiff need not allege or prove scienter."  *Thompson*, 238 F. Supp. 3d at 591 (quoting *SEC v. Glantz*, No. 94 Civ. 5737 (CSH), 1995 WL 562180, at *5

(S.D.N.Y. Sept. 20, 1995)).  Instead "[a] showing of negligence is sufficient" for a claim under section 17(a)(3).  *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).  Again, because the Court already determined that the elements of a section 10(b) and Rule 10b-5 claim are satisfied, the Court considers only whether there is a genuine issue of material fact with regard to whether Simeo acted negligently.  *See id.*; *Thomason*, 238 F. Supp. 3d at 591.

The Second Circuit "has not had occasion to consider what standard of care governs a negligence claim" under section 17(a)(3)."  *Ginder*, 752 F.3d at 574.  "But courts in this Circuit have not strayed far from a black-letter, 'reasonable person' standard in defining 'negligence'" under section 17(a)(3).  *SEC v. Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *14 (S.D.N.Y. Mar. 21, 2017) (collecting cases).  Thus under section 17(a)(3), "the definition of negligence is 'the failure to use reasonable care, which is the degree of care that a reasonably careful person would use under like circumstances.'"  *SEC v. Cole*, No. 12 Civ. 8167 (RJS), 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015) (Sullivan, J.).

Here, the evidence shows that Simeo acted negligently.  By failing to respond to the SEC's RFAs, Simeo admitted that he knew Yang was "not functioning as Viking's CFO" and had not been involved in preparing the company's SEC filings.  SEC's RFAs at 9 ¶¶ 50-51.  He further admitted that the SEC filings did not disclose the existence of the standing resignation letter even though this document gave Simeo the unilateral power to remove Yang from the position of CFO.  *Id.* at 8, 10 ¶¶ 37-38, 56; *see also* Dkt. 56, Exh. 20 at 370; Simeo Dep. Tr. at 42.  The evidence thus supports the conclusion that a reasonably careful person knowing that Yang was not serving as CFO would not have indicated so on SEC filings that would be relied on by the investing public.  Nor would a reasonably careful person omit from several quarterly and annual filings the lack of independence that Yang had, given Simeo's ability to certify filings on her behalf and remove her at his leisure.

21

*See Jankovic*, 2017 WL 1067788, at *18 (concluding that the defendant's material misrepresentations and omissions that "stretched on for months" constituted a violation of section 17(a)(3)).  There is no genuine issue of material fact with regard to whether Simeo acted negligently.

The Court thus grants summary judgment in favor of the SEC on its claim pursuant to sections 17(a)(1) and 17(a)(3) of the Securities Act because there are no genuine issues of material fact and the SEC is entitled to judgment as a matter of law.

### IV.  Conclusion

For the reasons stated, the Court grants the SEC's unopposed motion for summary judgment.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 53.

Although the SEC in its Amended Complaint requested that the Court impose injunctive relief and "a civil monetary penalty pursuant to Section 20(d) of the Securities Act . . . and Section 21(d)(3) of the Exchange Act," Am. Compl. at 11, the SEC's Motion did not discuss the SEC's request for such relief.  By September 17, 2021, the SEC shall file a memorandum of law outlining the SEC's requested relief (*i.e.*, injunctive and/or monetary) and citing any relevant authority justifying such relief.  With regard to any civil monetary penalty, the SEC should explain the following: (1) the "tier" of penalty that the SEC believes is appropriate, *see* 15 U.S.C. § 77t(d); *id.* § 78u(d); (2) the SEC's position on what constituted a "violation" here, for purposes of calculating any civil monetary penalty, *see id.* § 77t(d); *id.* § 78u(d); and (3) the total amount of civil monetary penalty requested.

If Simeo wishes to file a response to the SEC's filing regarding remedies, he must do so by October 1, 2021.  If Simeo fails to file an opposition by October 1, 2021, the Court will decide whether to order injunctive relief and whether to impose a civil monetary penalty against Simeo

without considering any arguments in opposition from Simeo.

     SO ORDERED.

Dated: September 3, 2021
      New York, New York

                                    JOHN P. CRONAN
                                 United States District Judge